Opinion issued March 8, 2012



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-01043-CR

———————————

Skylar James Bell, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 228th District Court

Harris County, Texas



Trial Court Case No. 1174910

 



 

MEMORANDUM OPINION

          A
jury convicted appellant, Skylar James Bell, of the first degree felony offense
of murder and assessed punishment at sixty years’ confinement.[1]  In two issues, appellant contends that the
State failed to present sufficient evidence that he (1) intentionally or
knowingly caused the death of the complainant, DeMarcus Washington,or (2)
intended to cause serious bodily injury to Washington and committed an act
clearly dangerous to human life that caused Washington’s death.

          We
affirm.

Background

          Around
11:00 p.m. on July 14, 2008, Houston Police Department (“HPD”) Officer L. Ross
was assisting in an investigation of a robbery on W. Tidwell Road in northwest
Houston.  As he was waiting for a city
wrecker to tow a stolen vehicle for evidence processing, he heard approximately
three or four gunshots.  Officer Ross,
who was standing in a parking lot, first notified the police dispatchervia his
handheld radio that gunshots had been fired, and he then pointed his patrol
car’s floodlight in the direction of the gunshots.  He first aimed his floodlight in between two
buildings of the Luxor Park apartment complex, which was located on the other
side of Tidwell from the parking lot in which he was parked, and he then shined
the floodlight between two different buildings of the complex.  After he scanned the area, Officer Ross drove
over to the apartment complex.  Officer
Ross discovered the body of the complainant, DeMarcus Washington, lying in a
courtyard, and he then “secured the scene” and waited for backup.

          On
cross-examination, Officer Ross testified that, although he heard three or four
gunshots, he did not see the “muzzle flashes” corresponding to these
shots.  He also testified that he shined
his floodlight at the apartment complex because it “was dark in [the] area” and
that he needed to use his flashlight while walking around the scene.  Officer Ross also stated that, when he shined
his floodlight, he did not see anyone moving around or running.  He did not find any potential suspects or
witnesses when he walked to the scene.

          On
redirect-examination, Officer Ross clarified that he shined his light into two different
areas:  he did not see any movement in
the first area, which is where he later discovered Washington, but he did see a
person in the second area, which was between two buildings to the left of the
murder scene.  He did not believe that he
would have been able to see that person had he not used his floodlight to
illuminate the area.  Officer Ross could
not determine any physical characteristics of this individual from where he was
located.

          HPD Crime
Scene Unit Sergeant J. Cruser, who was responsible for taking pictures of the
scene and gathering physical evidence, testified that officers found Washington
lying face-down in the dirt of a courtyard. 
He testified that he recovered a fired bullet located “very near” to
Washington’s body.  He stated that
Washington appeared to have been shot three times, twice in the back and once
in the neck.[2]

          Antoinette
Dunn, who lived at the Luxor Park apartments at the time of the shooting,
testified that she knew appellant through her sister and that she had seen him
around the complex “quite a few times.”  On
the night of the shooting, Dunn woke up around 10:00 p.m. and decided to go to
the Metro Mart convenience store, located across Tidwell from the apartment
complex.  After she left the Metro Mart,
she saw a police car and a city wrecker in the parking lot of the shopping
center.  Dunn was standing in the median
of Tidwell when she first heard a gunshot.

          Dunn
testified that, when she looked over into the apartments after Officer Ross
turned on his floodlight, she could see Washington and appellant running
through a grassy area of the complex.  She
stated that appellant was chasing Washington, and she first saw Washington when
he appeared in an alley between two buildings of the complex.  Appellant was slightly more than one arm’s
length behind Washington.  Dunn testified
that Washington was “running fast” and that appellant “had a gun in his hand
running after [Washington].”  She stated
that she had no problem identifying either Washington or appellant.  Dunn was still standing in the median on
Tidwell when she “saw the fire from the gun,” which corresponded with the
second gunshot that she heard.  She
testified that she saw appellant shoot Washington in the back and that
Washington did “a weird arch” when he was shot. 
Dunn also testified that nothing was blocking her view when she saw this
occur and that appellant was still chasing Washington when Washington arched
his back.  Dunn then heard another
gunshot, but she did not see the muzzle fire from this shot because Washington
and appellant had started running through another alley between two
buildings.  She also saw two other males,
approximately twenty-five feet behind Washington and appellant, running in the
same direction. Dunn did not see where Washington fell to the ground, but she
saw him stumble as he approached the alley. 
Dunn last saw appellant running through an alley to the back of a
parking lot in the complex.  She stated
that she had no doubt in her mind that appellant shot Washington.

          Dunn
testified that she did not speak with the police at the scene for fear of being
considered a “snitch” by her neighbors.Instead, she went to an HPDsubstation
the next afternoon and “told them [she] had information on the murder that
happened on the night before.”  Dunn specifically
identified appellant as the shooter, and she also gave a positive
identification of appellant when she viewed a photo-array.  She stated that appellant’s appearance had
changed in between the time of the shooting and the time of his trial and that,
at the time of the shooting, he wore his hair in dreadlocks.  She also testified that, even if she had
never viewed the photo-array, she would have been able to give an in-court
identification of appellant as the shooter because she recognized “the dark
color around his eyes,” his dreadlocks, and his distinctive walk.

          Caleb
Bledsoe, who was nine years old at the time of the murder and who also lived at
the Luxor Park apartments, testified that he had frequently seen appellant
around the apartment complex.He testified that, on the night of the shooting,
he was playing outside in front of his apartment around 10:00 p.m.  While he was outside, he saw Washington, whom
he also recognized as someone he had seen around the complex, and appellant in
the midst of a fist-fight.  He did not
see any weapons during this fight.  This
fight lasted approximately ten minutes before Washington and appellant walked
to a nearby parking lot in the complex and started fighting again.  Bledsoe saw Washington punch appellant hard
in the face and then the fight broke up and appellant walked away.

          Bledsoe
returned to the stairs in front of his apartment, and he saw Washington
standing by himself nearby for approximately five minutes.  Appellant then reappeared, and, as hewalked
over to Washington, Washington moved behind a building in the complex, which
blocked him from Bledsoe’s view.  Bledsoe
saw appellant with a gun, and he saw appellant shootin Washington’s direction.  He testified that he saw appellant shoot the
gun and then run off.  He could not see
Washington at this point, but he testified that “[i]t looked like [appellant]
was trying to chase [Washington].”  Bledsoe
heard “a couple more shots,” and a few minutes later, he walked over to a
courtyard in the apartment complex and saw Washington lying on the ground.  The last time Bledsoe saw appellant was after
he fired the first shot at Washington.

          Bledsoe
later talked to officers at an HPDsubstation, and he told the officers that
“Skylar shot [Washington].”  Bledsoe
positively identified appellant as the shooter in a photo-array.  When asked why he identified appellant in the
photo-array, Bledsoe responded, “[Because] he was the one who shot
[Washington].”Bledsoe
agreed with Dunn that appellant’s appearance had changed by the time of trial
and that he had dreadlocks at the time of the shooting.

          Equivalent
Powers, who has three prior felony convictions, also testified that he lived in
the Luxor Park apartments at the time of the shooting and that he had seen
appellant around the complex on many occasions before the shooting.  He agreed with Dunn and Bledsoe that
appellant’s appearance had changed since the shooting and that appellant used
to wear his hair in dreadlocks.  He also
stated that he knew Washington and that he had seen him on many occasions at
the complex.

          Powers
testified that he walked across Tidwell to a barbecue truck near the Metro Mart
after 10:00 p.m. on the night of the shooting. 
While he was standing in that parking lot, he heard “an altercation” at
the apartments and walked back across the street to investigate.  He saw Washington and appellant fist fighting,
but he did not see any weapons.  He
stated that he was not aware of why Washington and appellant stopped fighting,
but after they did he walked back across Tidwell to the Metro Mart parking
lot.  A few minutes later, Powers heard
gunshots come from between two buildings in the apartment complex.  Powers saw Washington running in between
buildings.  He acknowledged that the
lighting was poor, but he identified Washington by his build and the way that
he ran.  He then saw appellant running a
few feet behind Washington.  He did not
see appellant holding a weapon.  Powers
later positively identified appellant’s picture in a photo-array.

          The
written jury charge, which tracked the language of the indictment, instructed
the jury to convict appellant of murder if it found beyond a reasonable doubt
that appellant either “unlawfully, intentionally or knowingly cause[d] the
death of Demarcus Washington, by shooting Demarcus Washington with a deadly
weapon, namely, a firearm” or “unlawfully intend[ed] to cause serious bodily
injury to Demarcus Washington, and did cause the death of Demarcus Washington
by intentionally or knowingly committing an act clearly dangerous to human
life, namely by shooting Demarcus Washington with a deadly weapon, namely, a
firearm.”  The jury found appellant
“guilty of murder, as charged in the indictment” and assessed punishment at
sixty years’ confinement.  This appeal
followed.

Sufficiency of the Evidence

          On
appeal, appellant contends that the State failed to present sufficient evidence
that he (1) intentionally and knowingly caused Washington’s death or (2) intended
to cause serious bodily injury to Washington and committed an act clearly
dangerous to human life that caused Washington’s death.

A.  
Standard of Review

When reviewing the sufficiency of
the evidence, we view the evidence in the light most favorable to the verdict
to determine whether any rational fact finder could have found the essential
elements of the offense beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Brooks v. State, 323 S.W.3d 893, 912
(Tex. Crim. App. 2010) (holding that Jackson
standard is only standard to use when determining sufficiency of evidence).  The jurors are the exclusive judges of the
facts, the credibility of the witnesses, and the weight to be given to the
testimony.  Brooks, 323 S.W.3d at 899; Bartlett
v. State, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008).  A jury may accept one version of the facts
and reject another, and it may reject any part of a witness’s testimony.  See
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000), overruled on other grounds, Laster v. State, 275 S.W.3d 512 (Tex.
Crim. App. 2009); see also Henderson v.
State, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d)
(stating jury can choose to disbelieve witness even when witness’s testimony is
uncontradicted).  We may not re-evaluate
the weight and credibility of the evidence or substitute our judgment for that
of the fact finder.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We afford almost complete deference to the
jury’s determinations of credibility.  See Lancon v. State, 253 S.W.3d 699, 705
(Tex. Crim. App. 2008).  We resolve any
inconsistencies in the evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); see also Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim. App.
2007) (“When the record supports conflicting inferences, we presume that the
factfinder resolved the conflicts in favor of the prosecution and therefore
defer to that determination.”).

B.  
Penal Code Section 19.02(b)(1)

A person commits the offense of
murder if he intentionally or knowingly causes the death of an individual.  Tex.
Penal Code Ann. § 19.02(b)(1) (Vernon 2011).  A person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the
result.  Id. § 6.03(a) (Vernon 2011). 
A person acts knowingly, or with knowledge, with respect to the nature
of his conduct or to circumstances surrounding his conduct when he is aware of
the nature of his conduct or that the circumstances exist.  Id.
§ 6.03(b).  A person acts knowingly,
or with knowledge, with respect to a result of his conduct when he is aware
that his conduct is reasonably certain to cause the result.  Id.  “Intent is almost always proven by
circumstantial evidence.”  Trevino v. State, 228 S.W.3d 729, 736
(Tex. App.—Corpus Christi 2006, pet. ref’d); see also Hart v. State, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)
(“Direct evidence of the requisite intent is not
required . . . .”). 
“A jury may infer intent from any facts which tend to prove its
existence, including the acts, words, and conduct of the accused, and the
method of committing the crime and from the nature of wounds inflicted on the
victims.”  Hart, 89 S.W.3d at 64.

The intent to kill the complainant
may be inferred from the use of a deadly weapon in a deadly manner.  Adanandus
v. State, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); Watkins v. State, 333 S.W.3d 771, 781 (Tex. App.—Waco 2010, pet. ref’d);
see also Sholars v. State, 312 S.W.3d
694, 703 (Tex. App.—Houston [1st Dist.] 2009, pet. ref’d) (“[I]ntent to kill
may be inferred from the use of a deadly weapon, unless it would not be
reasonable to infer that death or serious bodily injury could result from the
use of the weapon.”).  If the defendant
uses a deadly weapon in a deadly manner, the inference of intent to kill is
almost conclusive.  Watkins, 333 S.W.3d at 781; Trevino,
228 S.W.3d at 736.  When a deadly weapon
is fired at close range and death results, the law presumes an intent to
kill.  Womble v. State, 618 S.W.2d 59, 64 (Tex. Crim. App. 1981);Watkins, 333 S.W.3d at 781; see also Draper v. State, 335 S.W.3d 412, 415 (Tex. App.—Houston
[14th Dist.] 2011, pet. ref’d) (“Testimony at trial showed that appellant used
a deadly weapon—a firearm—at
close range to shoot and kill the victim. 
The jury was entitled to infer appellant’s intent from this evidence.”);
Sholars, 312 S.W.3d at 704 (“The jury
was free to infer that appellant intended to kill either Boutte or the
complainant when he pointed the gun at Boutte and fired the shots into the
gaming room.”).  A deadly weapon is “a
firearm or anything manifestly designed, made, or adapted for the purpose of
inflicting death or serious bodily injury, or anything that in the manner of
its use or intended use is capable of causing death or serious bodily
injury.”  Tex. Penal Code Ann. § 1.07(a)(17) (Vernon 2011); Sholars, 312 S.W.3d at 703.

          Here,
Antoinette Dunn testified that she heard a gunshot while she was walking across
Tidwell to the Luxor Park apartment complex, and she saw appellant chasing
Washington in between the buildings of the complex.  She stated that she could clearly see both
Washington and appellant; that Washington was running away quickly; that
appellant was slightly more than one arm’s length behind Washington; and that
Washington was not holding a weapon.  She
also testified that she saw appellant shoot Washington in the back and that
Washington did “a weird arch” that corresponded with the second gunshot and a
muzzle flash.  She saw Washington stumble
as he reached another alley, and she last saw appellant running away from the
scene toward another parking lot in the complex.  She stated that she had no doubt in her mind
that appellant shot Washington.

          Caleb
Bledsoe testified that he saw Washington and appellant fist-fighting in the apartment
complex.  Washington and appellant
momentarily paused in their fight, walked to a different part of the complex,
and started fighting again.  Eventually,
after Washington punched appellant very hard in the face, the fight broke up,
Washington returned to the area near Bledsoe’s apartment, and appellant walked
away.  Bledsoe then saw appellant return
with a gun, and, although he could not see Washington because Washington had
moved behind a building, he saw appellant shoot the gun in Washington’s
direction.  He then saw appellant run
away, presumably chasing Washington, and he heard several more gunshots.  Bledsoe subsequently walked over to a
courtyard in the apartment complex and saw Washington lying on the ground with
three gunshot wounds.

          Although
Powers testified that he never saw a weapon and he never saw any gunshots, he
agreed with Bledsoe that Washington and appellant were involved in a fight on
the evening of the shooting, and he agreed with Dunn that he saw appellant
chasing Washington after he heard gunshots. 
Powers, Bledsoe, and Dunn all identified appellant’s picture in a
photo-array, and Bledsoe and Dunn specifically told police officers that
appellant was the one who shot Washington.

          Testimony
at trial thus demonstrated that appellant used a deadly weapon—a firearm—at
close range and that Washington died as a result.  The jury was therefore entitled to infer from
this evidence that appellant intended to cause Washington’s death.  See
Draper, 335 S.W.3d at 415 (“Testimony at trial showed that appellant used a
deadly weapon—a firearm—at close range to shoot and kill the victim.  The jury was entitled to infer appellant’s
intent from this evidence.”); Sholars,
312 S.W.3d at 704 (“The jury was free to infer that appellant intended to kill
either Boutte or the complainant when he pointed the gun at Boutte and fired
the shots into the gaming room.”); Trevino,
228 S.W.3d at 737–38 (“From the evidence, the jury could reasonably infer that
by opening fire with a semi-automatic weapon on an occupied vehicle, Trevino
specifically intended to kill either or both of the occupants of the
vehicle . . . .”); see
also Adanandus, 866 S.W.2d at 215 (“Further, ‘[i]f a deadly weapon is used
in a deadly manner, the inference is almost conclusive that [the defendant]
intended to kill . . . .’”); Womble, 618 S.W.2d at 64 (“[W]here a deadly weapon is fired at
close range and death results the law presumes an intent to kill.”).

Any inconsistencies in the
witness’s testimony “concern the credibility and weight
to be given certain testimony.”  Draper, 335 S.W.3d at 415.  The jury is the exclusive judge of the
credibility of witnesses and the weight to give their testimony.  Id.;
see also Lancon, 253 S.W.3d at 705 (stating
that we afford almost complete deference to jury’s determinations of
credibility); Williams, 235 S.W.3d at
750 (declaring that we may not re-evaluate weight and credibility of evidence
or substitute our judgment for that of fact finder).  Moreover, we resolve inconsistencies in the
evidence in favor of the jury’s verdict. 
Clayton, 235 S.W.3d at 778; Curry, 30 S.W.3d at 406.  We therefore conclude that a rational fact
finder could have found beyond a reasonable doubt that the State presented
sufficient evidence that appellant intentionally or knowingly caused
Washington’s death.

          We
overrule appellant’s first issue.[3]




 

Conclusion

          We
affirm the judgment of the trial court.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel
consists of Justices Keyes, Bland, and Sharp.

Do
Not Publish.   Tex. R. App. P. 47.2(b).











[1]           SeeTex. Penal Code Ann.
§ 19.02(b)(1), (2) (Vernon 2011).





[2]           Dr. PramodGumpeni of the Harris
County Medical Examiner’s Office conducted Washington’s autopsy and confirmed
that he had sustained three gunshot wounds. 
Dr. Gumpeni testified that either of the two entrance wounds on
Washington’s back could have been fatal. 
He also testified that Washington had cuts and bruises on his face, and
these injuries were consistent with either falling to the ground after being
shot or having been in an earlier fight.





[3]           Because we hold that the State
presented sufficient evidence that appellant intentionally caused Washington’s
death, we need not address his second issue—whether the State presented
sufficient evidence that appellant intended to cause serious bodily injury to
Washington and committed an act clearly dangerous to human life that caused
Washington’s death.  The State charged
appellant under Penal Code section 19.02(b)(1) and section 19.02(b)(2), and the
jury found appellant guilty of murder “as charged in the indictment.”  “[W]hen a general verdict is returned and the
evidence is sufficient to support a finding under any of the paragraphs
submitted, the verdict will be applied to the paragraph finding support in the
facts.”  Amis v. State, 87 S.W.3d 582, 587 (Tex. App.—San Antonio 2002, pet.
ref’d) (quoting Manrique v. State,
994 S.W.2d 640, 642 (Tex. Crim. App. 1999)).